The next case before the court is Kottenstette v. Secretary of HHS. Case number 20-2282 is an appeal from the Court of Federal Claims, which in turn heard an appeal from the Vaccine Special Master. Mr. McHugh, are you ready to proceed? I am, Your Honor. Okay. Go ahead. Thank you, Your Honors. My name is John McHugh, and I'm representing the family of C.K., as we call her in the record. She is the daughter of the Kottenstette family. She was born on June 1, 2012, and she was developing normally until October 2 of 2012 when she received four vaccines, including DPAT, and within a few hours, that happened at 1045 in the morning, and at 830 in the evening, she had the first of her lifelong seizures, which have continued and are devastating and have essentially destroyed her, basically her life. So the issues before the court today are the remand of Special Master Millman's December of 2017 decision granting compensation, and then the second part of that is after remand, the court again then sustained the decision of Special Master Horner, which denied it. Counselor, I have a question on the first remand. Did the court remand with instruction? And in your view, exactly what was the basis of the remand? A failure to apply the appropriate legal standard, or was there a failure of evidence to meet that standard? The court held that under Boltman, it was an error for the Special Master to rely on Dr. Marcel Kinsborn's opinion that the DTAP vaccine shot can do the same damage as DPT, but less frequently. Now, this came up in the hearing, and Dr. Kinsborn was testifying, and the Special Master, and it's quoted in both our briefs, asked him a specific question. She said she'd seen this before. Now, you have to understand, this is a Special Master who was sitting on that court 28 years at this time, and she's talking to a pediatric neurologist who'd been doing this work for 60 years and had been an expert in this court since it started. And was also involved in specific research involving DPAT long ago. At any rate, she asked him, she said, she understands that some people say you cannot use a study of DPT in order to determine whether DPAT can cause the same thing, because DPT is far more dangerous than DPAT. DPAT is safer. And she said she believed that safer is not safe, and therefore, the study that she's referring to is the Bellman study, which was part of the National Children's Encephalopathy Study in 1983, that had found that pertussis vaccines, or DPT and DPT caused the onset of, not the onset, it triggered onset of infantile spasms within one week after the delivery of the DPT and DPT vaccinations. Where in the record exactly did Special Master Millman say that? Oh, in the record? Okay, let's see. Yeah, because it's not in her opinion. She refers to it, but she doesn't cite it. Where does she say it? I should have that, but I don't. Let's see. Is it there? Okay. That's a very good question. Okay. Well, maybe you can find it and tell me on rebuttal, but did you introduce any evidence that that was the case, that it may be safer, but it's not safe? Was there any other evidence? Well, at the time, we had not introduced evidence on that point. We had, in our complaint, I should say our petition, we had cited the case law where the vaccines were basically treated equally, and we also cited that in the 42 CFR section 100.3, the table, the reactions to all three of these vaccines, DPT and DPAT, were treated equally. So the government saw no difference. Case law saw no difference, and decisions that we did put into the record showed that the manufacturer saw no difference. So essentially, everybody agreed that DPAT and DPT both could cause seizures, and that's all we were interested in. All that author requires is that we show it can happen. But this is a special master who said she'd seen it before, so she was essentially taking judicial notice of the fact that she believed that just because it's safer doesn't mean it doesn't do the same thing. If a seizure disorder of this type shows up within one week, then it's... But the table that you refer to when you're saying the government doesn't see a difference, that refers to acute spasms that CK did not suffer, isn't that right? There's nothing worse than infantile spasms. Infantile spasms are lifelong, and they're about as bad as you can get. So there's nothing unacute about these spasms. She had them, and it happened within 10 hours. And then it kept happening. And it was diagnosed a few days later by Boston Children's as being the infantile spasms. And it was treated with moderate success by the use of this drug ACTH, and that becomes quite critical later on in this. ACTH is a steroid produced by the brain in response to any stress where the brain releases an excitability hormone, which is basically RCH. But anyway, ACT dampened this in her. Now, Dr. Kingsborn was involved at Great Osborne Street Hospital in London in 1957 and 58 in a study that determined that ACT could be used to treat infantile spasms. And they determined that the problem with kids who have infantile spasms is their brain does not produce enough ACT in response to any stimuli, and that could be a vaccine or an infection or anything else. So it's important to dampen the stress response that causes excitability in the brain because of the presence of the other compound. Counselor, I don't want you to run out of time here without addressing some of these other questions. And I'm concerned as to what happened in the procedure here. So the court of appeals remands to the special master. A new special master, Master Horner, takes over the case. Am I correct so far? That's correct. What is it that the special master was supposed to do, to have a de novo hearing or to review the opinion of special master Milner? He was to review the opinion of special master Milner. He did not have a de novo hearing. And so at that hearing, we attempted, under the federal rules of evidence, to ask him to take judicial notice of what special master Milner had stated, that it was safer but not safe and therefore you could. And this particular point you're talking about now, is this the point that the court of federal claims said was unclear? No. The special master on remand actually found that DPAT could cause the seizure disorder. So the prong one of Alvin was met. He then, however, went through Dr. Kinsporn. Dr. Kinsporn explained how the vaccine. He was not talking necessarily about just DPAT. He was talking about all of them. She got four vaccines that day. Every one of them would cause an immune reaction, which would set off this chain reaction in the brain, which causes an executory hormone to be produced. And then that is neutralized by the act. Mr. McHugh, this is Judge Schultz. I just want to make sure I follow up on Judge Renner's question before your time runs out. What are you relying on, for example, in the court of federal claims mandate or order to suggest that the second magistrate, the special master Horner, was obligated to follow any of the fact findings or anything of special master Mittelman? Well, I don't believe there was anything that required him to do so. But the fact is that he ruled that special master Millman was correct with regard to the connection between DPAT and seizures. He did say at some point that it was barely satisfied prong one. Satisfied prong one, he satisfied that it could happen. Then his error was he held that because there was no fever in this child at the time of the first seizure, that obviously there was no autoimmune reaction, I mean immune reaction, that Dr. Kinsmore was talking about to set off this chain of events. Well, unfortunately, this is a vaccine court. Vaccines cause an immune reaction, period, across the board without exception. And the presence of fever is irrelevant. Some people, everybody, all of us probably got vaccines recently. How many of us got fevers? You do not need a fever to have an immune reaction. It happens without fever or with it. And so that, as far as we're concerned, that is arbitrary and capricious, especially in a vaccine court, which is dealing with this stuff all day. So did Special Master Horner determine, what did Special Master Horner review? The sufficiency of the evidence that Special Master, before Special Master Milner, the sufficiency of that evidence? Yes. Did Special Master Horner re-weigh the evidence? Yes, that was one of the problems. He re-weighed the evidence on the whole thing and reached his own conclusion. He essentially reversed Special Master Milner on the issue that was before him, which was whether she had sufficient evidence before her to reach the conclusion that the Milner study was relevant. But he didn't do that. When you said reverse, and now we're getting to the point where, for me, the rubber meets the road, you have one Special Master that's reviewing the decision of another Special Master at the behest of the Court of Federal Claims, who clearly has the jurisdiction and authority, the obligation, to review property appeal decisions of a Special Master. But here, it seems to me that Special Master Horner was acting as a Court of Federal Claims judge and reviewing Special Master Milner's opinion. Well, you're absolutely right. He did do that, and that is not his job. And so, basically, she had reached this conclusion. He determined initially that she was correct because the vaccine could do it, and therefore her conclusion that if it can do it, the Billman study is relevant, is sustained to some extent. He then goes further and says that because Special Master Milner had not gone through the Alton prongs, he determined he'd do it himself and deemed that even though she was right on prong one, she was wrong that prong two had not been sustained because of the lack of the fever. And it wasn't his job because she had... Okay. Counsel, we're way past your time. I'll restore three minutes for rebuttal, but I think we need to hear from the government. Thank you. Ms. Collette, are you prepared to go forward? I am. May it please the Court, my name is Camille Collette, and I represent the Secretary of Health and Human Services. The original Special Master committed legal error because she did not evaluate the evidence under the preponderant evidence standard in Alton, which has been a legal standard in the vaccine program since 2005 and which has been applied in the evaluation of off-table cases since then. She did not evaluate the evidence under the correct legal standard, and this is not a closed case. Is that what the Court of Claims actually said, or did the Court of Claims say that Newtson didn't stand for the proposition that she thought it did? And so because that infected her legal analysis, that it had to go back. Well, I think that it had to go back for that reason, and I think it also had to go back because she did not evaluate the evidence under Alton and there was no sound and reliable medical theory that was put forth here, and that Bellman and Melchor were inadequate evidence to find Alton. Did the Court of Claims actually make those findings with respect to the rest of the factual record? I thought that it pretty much based its decision on the fact that Newtson didn't say what, or they believed Newtson didn't say what she thought it did. No, I mean, I think that the Court remanded because they found that Newtson didn't say what she thought it did. Right, and so beyond that, and I think this might go to the questions that Judge Raynor was asking, I mean, they did not do an analysis of the rest of the findings or the rest of the factual record, did they? They did not. He evaluated the record and found facially that it was apparent that the correct legal standard had not been applied. Right. Okay. Now let me then ask you, on remand, Special Master Horner did not take any new testimony, correct? He did not. He did not. And really the facts of this case are largely undisturbed. I mean, he didn't really weigh the evidence. This case involves a failure of proof. Petitioners did not prove by preponderant evidence a medical theory linking the DTaP vaccines to infantile spasms. They did not prove a logical sequence of cause and effect. On the record, though, the first time around, didn't Special Master Millman specifically ask the expert about the ability basically to apply the information about DTP to DTaP, and he said it could? So that testimony, that evidence was rebutted by our expert, Dr. Zempel, when in his initial report, where he opined that conflating the DTP studies, conflating the effects of DTP to DTaP, that there were just real limitations with that evidence. And in my pre-hearing brief, which is – Yeah, but I guess what I'm trying to understand is that the first time around, Special Master Millman specifically asked the expert if the Bellman study could apply to DTaP, and that expert said yes. She accepted that testimony, found it to be credible and reliable, and the second time around, Special Master Horner just said Bellman's completely irrelevant because he weighed the testimony differently. I guess what I'm trying to understand is how he could make that determination when he didn't hear the experts testify. Well, actually, he did not – he actually accepted Bellman as having limited relevance. It's Melchor that he rejected because it was a distinct vaccine formulation. These are distinct vaccine formulations. The A-cellular pertussis vaccine is a distinct vaccine from the whole-cell pertussis vaccine, and there is no evidence that DTaP causes infantile spasms, which is another point that I would like to correct that Mr. McHugh made in his opening, which is that infantile spasms are not seizures. Infantile spasms are an epileptic encephalopathy of childhood that presents with co-occurring encephalopathy, epileptic spasms, and hypsarrhythmia on EEG. Seizures and infantile spasms cannot be conflated.  And... Counselor, when I read the special master Horner's decision, I'm left with the distinct impression that he reweighed the evidence anew, that instead of looking at special master Milner's decision to determine whether the accurate legal standard was applied or not, and that's a yes or no answer. Instead, the special master not only reviewed the record anew, but made new findings, reached a different conclusion on the application of the legal standard, and then denied petitioner the opportunity to submit evidence that went to the very questions that special master was reviewing. Well, I think when the court remanded... The court actually vacated the original special master's decision and remanded the case for reconsideration under the correct legal standard. So I think, you know... So it was a reconsideration.  It was a reconsideration of the... I apologize. It was... The special master was asked to make a new decision on the basis of the record, or just to make a new decision on the basis of the correct legal standard, correct? Correct. On the basis of the correct legal standard and in evaluating that evidence. Now, hold on. So the special master did actually conduct a de novo hearing or a de novo review based on what the special master thought was the correct legal standard. Counsel? Is that a yes or a no? Because you'd need to answer the question, did special master Horner re-weigh the evidence anew? Did he do that? It's just a yes or a no. And then I have another follow-up question for you. No. I think that he applied... He deferred to the special master Millman's findings, or did he make his own independent findings? He applied the legal standard to the findings that he had made. Okay. So did he make new fact findings? He came to some different conclusions, yes. But those conclusions... He made new fact findings. Yes, he did. Correct? Correct. Okay. Now I have another question for you. When I look at page A42 with the remand language from the Court of Federal Claims, it says, the case is remanded so the special master may consider the petitioner's theory and evidence under the correct legal standard. Do you think this gave special master Horner the ability or authority to re-weigh the facts? I think it gave him the authority to evaluate the facts under the correct legal standard. I don't think he re-weighed the evidence. I think he applied the legal standard to the facts from the original... He conducted... I'm sorry, so go ahead. I was just going to ask, are you aware of any authority that would say that Judge Horner either can or cannot re-weigh the evidence? Do the fact findings become, in essence, for lack of a better word, law of the case? When they're not appealed? Yes. They do become law of the case. Okay, thank you. What's the legal authority on that? I'm... I don't have an answer at my fingers. I don't have an answer at my fingertips. I apologize. Okay, go on. Special Master's Horner's decision on remand was correct and should not be disturbed. He found that petitioners failed to meet the burden under Olson. He evaluated the evidence. He declined to extrapolate the studies that involved whole-cell pertussis to the current acellular formation based on Dr Kinsmore's testimony because it was not explained. He looked at the Melchor study and found that the conclusions in that study were based on statistical observations and limited the applicability of that study both because he gave limited weight to Bellman because it tested a standalone diphtheria and tetanus vaccine in addition to testing DPT and... but found that there was inadequate support to find that the DTaP vaccine can cause infantile spasms under the first prong of the Olson test. But he did find... Councillor, on that basis right there, the new finding, and now we're getting to... You're actually using in your argument new findings. You're using the word. So, let's say that the Special Master Horner made new findings. And that means reweighed the evidence, reconsidered it, and why is it not error that the Special Master refused to allow the petitioner to submit what they considered to be evidence on the very question that was under review? And I say that in view of the fact that the Vaccine Act is remedial in nature. Our court has said this a number of times. This is a remedial act. It's... While there may be some adversarial aspect to it, it's not supposed to be an adversarial contest here. Understood. You know, I think that the Special Master considered the evidence and declined to introduce it because it's not relevant to the question at hand here. The evidence... The evidence that petitioner wanted to introduce both before Special Master Horner and before Judge Hertling and which are now in the appendix, in the joint appendix, they speak to seizures, febrile seizures, not to infantile spasms. Infantile spasms are a distinct injury of early childhood that we don't know in the majority of cases how they are caused. And the evidence that petitioner is putting forth or the articles that he was putting forth and has put forth in the appendix actually speak to febrile seizures, which are not at issue here. Okay, counsel. Let's just hear the rebuttal. Mr. McHugh? Thank you, Honor. As to your question before, part of the transcript, appendix 1495, is the conversation that starts on line, I guess, line nine and goes down to line 19. It basically... She basically says these are the two sides of this story. Some people say you can't use DPT to deal with DPAT. She says she disagrees and believes it's relevant because safer is not safe. Therefore, what has been found in the Bellman study applies. Now, the Bellman study is unique because it was dealing with infantile spasms, specifically. And so it found that infantile spasms were triggered, not caused, triggered by the vaccine within seven days. So essentially, Special Master Millman and Special Master Millman explained that the Bellman study had been very careful in what it was doing. It isolated the two, three vaccines it was dealing with and separated all the classes out. And they had basically done a very good job of making sure they didn't merge results. But the Bellman study found that within one week of the DPAT and the DT vaccines, all three of those, of course, all of those are relevant to DPAT because they're all in the same place. And all of them found that one week afterward, there was an uptick. Mr. McHugh, I have a quick question. Just for clarification to make sure I understand, looking at the pages 1495 to 96, and I'm to understand that your safer but not safe language is a paraphrase of what she said, right? It's not a quote, right? Well, she says basically that there's still reactions that you can use to analysis. I see that. Thank you. It's in there. Not all of them speak precisely. As to what Special Master Horner did, he did re-weigh the evidence. He refused to allow us to put in evidence that was directly on point, and especially the Canadian study, which determined not only that it was safer, but it was 76% safer. I mean, they came down to an actual number. And other studies that say even though it's safer, we are seeing the same value, the same injuries, in the same ratio to each other. In other words, it's reduced, but it looks like the same thing but smaller. And so Special Master Millman was perfectly correct in determining that the Bellman study, which was the only thing we can find on infantile spasms specifically, the Bellman study was useful. As to the confusion between seizures, we're talking about brain injuries, but Dr. Kinsborn's work in 1957 and 58 was specifically on infantile spasms and the effect of ACT, or whatever that is, ACT on dampening that reaction, and the fact that that is a naturally produced product of the brain. And so if ACT works, it indicates that the missing, the lack of ACT is the cause of the condition that makes this kid an eggshell plaintiff. She is susceptible to anything that sets off her immune reaction, and a vaccine is going to do it a lot better than basically a flu. But here she had four vaccines. Dr. Kinsborn was not focused exclusively on DPAT. He was focused on the fact that she got four vaccines that morning and had a reaction. Look at his split. He testified that normally when infantile spasms are detected, it takes months for them to become clinical. It is a very insidious problem that comes up, and to the fact that it happened in 10 hours and that is intractable. Infantile spasms also tend to disappear as the child grows. This one didn't. It didn't go down, and after ACT, it became drug-resistant. Right now, this child is essentially just alive and seizing several times a day. At the hearing, she was seizing continuously. So this is a tragic case, and this is supposed to be a remedial program, and we shouldn't be playing gotcha. Okay, counsel. Okay, your time is up. Thank you. Thank you very much. All right, the case will be submitted. The Honorable Court is adjourned until tomorrow morning at 10 a.m.